## JOHN B. GREGORY, Appellant, v. JOHN S. JONES et al., Respondents.

St. Louis Court of Appeals, March 31, 1903.

1. **Note, Action on: BOOK ENTRIES, ADMISSIBILITY OF.** Payments on a note are ordinarily evidenced by an indorsement of them on the back of the note, and on principle and authority such entries, whether kept in a memorandum book or not, are not the proper subject of book account, and hence do not come within the purview of the statute.

2. ———: ———: **ACCOUNTS READ TO JURY, INADMISSIBLE.** In an action on a note, defendant testified as to a slip from his account book containing an entry of a payment, which was admitted in evidence, and was then permitted to read in evidence several accounts against other parties copied from the same book, which accounts he had hung on a hook, together with the slip, and· put away in an envelope, which he had not seen till just before the trial twenty years afterwards. *Held,* that the court erred in permitting the reading of these accounts, as neither the witness nor the entry could be corroborated in this way.

3. ——: ——: ——: STATUTES, CONSTRUED. Such en-
tries do not come within Revised Statutes 1899, section 4652, pro-
viding that in actions where the matter at issue is proper matter
of book account a party may testify in his own favor as to when
the entries were made and in whose handwriting, and section 4653,
providing that in such actions no disputed account shall be allowed
on the oath of the party when he has a book of original entries,
unless the book be produced.

Appeal from Audrain Circuit Court.—*Hon. Elliott M. Hughes,* Judge.

REVERSED AND REMANDED.

*P. H. Cullen* for appellant.

(1) Under the present practice in this State an
account book of original entries, fair on its face, and
shown to have been kept in the usual course of busi-
ness, by the party himself or his clerk, is admissible
even in the party's own favor. Anchor Milling Co. v.
Walsh, 108 Mo. 277; Robinson v. Smith, 111 Mo. 205;
Seligman v. Rogers, 113 Mo. 642. (2) It is a general
rule running through all the decisions, and finding im-
mediate support in the cases herein both at common law
and under the statutes, that, to justify the reception in
evidence of a party's books of account, it must appear
that they are his regular books of account, containing
entries of his business transactions from day to day in
the regular course of his business. Moody v. Robert,
41 Miss. 74; Karr v. Stivers, 34 Iowa 123; Dickson v.
Kewanee Electric Light and Motor Co., 53 Ill. App. 379;
Ryan v. Dunphy, 4 Mont. 356; Barnet v. Steinbach, 1
W. N. C. 335; Barton v. Dundas, 24 U. C. Q. B. 273.

*W. W. Fry* for respondent.

(1) This evidence shows John S. Jones made the
entry of payment of $300 in June, 1879, by him, at the
time the payment was made, in the usual course of busi-
ness and in a book of his kept by him of his general bus-

iness. This was sufficient for its admission. The Anchor Milling Co. v. Walsh, 108 Mo. 277; Robinson v. Smith, 111 Mo. 205; Seligman v. Rogers, 113 Mo. 42; Rogers v. Vette, 142 Mo. 571. (2) Again, it is claimed that defendant failed to prove that it was entered on a regular book of accounts. Defendant testified that during 1879 he kept a book in which he entered all receipts and payments of money and expenses from day to day during that year. In this book was the entry of the payment of the $300, made by defendant at the time of the payment. This is just like the case of the Anchor Milling Co. v. Walsh, 108 Mo. 277.

BLAND, P. J.—Omitting caption the petition is as follows:

"Plaintiff states that defendants, by their promissory note herewith filed, dated 21st day of Dec. 1878, promised to pay to John B. Gregory, plaintiff, or order, $1,200, four months after date, for value received, with interest thereon at the rate of ten per cent per annum from date until paid, and if interest is not paid annually to become as principal, and bear same rate of interest; that defendants have made the following payments on said note:

"July 20, 1880, paid $500.
"November 13, 1880, paid $88.72.
"December 31, 1881, paid $250.
"March 28, 1882, paid $200.
"December 21, 1883, paid $100.
"December 5, 1885, paid $50.
"December 17, 1887, paid $50.
"September 18, 1889, paid $50.
"December 5, 1890, paid $50.
"February 1, 1892, paid $50.
"January 8, 1894, paid $50.
"December 24, 1895, paid $40.

"All of which said payments have been entered as credits on said note. Plaintiff states that he is now

the owner and holder of said note, that the same is past due and that the remainder thereof of said note and interest is yet due and owing to the plaintiff by defendants, for which sum, together with costs he prays judgment.''

The defendants filed the following answer:

''Now comes the defendants and for their answer to plaintiff's petition admit that they executed the note sued on and admit that the twelve payments credited on said note were made by the defendants at the date of said several credits, and the same are correct.

'' But the defendants further state that the defendant, John S. Jones, did make a payment of three hundred dollars on said note on the 9th day of June, 1879, which payment the plaintiff neglected and failed to credit on said note, and defendants are entitled to a credit of said sum of three hundred dollars on said note on June 9, 1879, as a payment thereon at said date.

''Defendants state that the payment of fifty dollars, credited on said note on December 5, 1885, paid off and satisfied said note and made an overpayment of $27, and that said payments credited in 1887, 1889, 1890, 1892, 1894 and 1895 were overpayments on said note made by mistake, and that defendants have overpaid plaintiff on said note to the amount of three hundred and seventeen dollars. Defendants state they did not see said note from the time it was executed until 1901, and that said payments were made on said note from time to time without seeing said note, and relying all the time on plaintiff to credit said payments, and with no knowledge of the amount they had paid or that they had overpaid the same.

''Defendants therefore plead payment of said note, and state that they have overpaid the same to plaintiff in the sum of three hundred and seventeen dollars. Defendants therefore say that the plaintiff is indebted to them in the sum of three hundred and seventeen dol-

lars, for which amount, with interest and cost, they ask judgment.''

The reply was a general denial of the new matter in the answer.

There was a verdict for the defendants assessing their damages at $318. Motions for new trial and in arrest proving of no avail, plaintiff appealed.

The whole of the evidence at the trial was directed to the alleged payment of $300 on the note made on June 9, 1879. In respect to this payment one of the defendants, John S. Jones, testified as follows:

"By Mr. Fry: Mr. Jones, when was your attention called, or when after this note was signed, about did you next see it? A. I saw it at your office.

"Q. When? About when? A. About in January. It has been about a month ago, I guess.

"Q. Speak a little louder. A. It has been about a month ago, gentlemen, I think.

"Q. Had you seen a copy of the notes and credits before that? A. No, sir, I never had seen that note or a credit on it up to that time.

"Q. Well, did your son, Eugene, show you a copy of the notes and the credits on the note or call your attention to it? A. Yes, sir. That was in August, I think.

"Q. What August? A. This present August. I told him to get them. I told him to get a copy of the credits.

"Q. Now when your attention was called to the credits on the note, state whether all the payments you had made had been credited on the note? A. I said I was entitled to $400 or $500 more money I had paid on that note.

"Q. I am not asking you what you said. State whether at that time, as a matter of fact, the note had been credited with all you had paid on it? A. No, sir, it had not been credited when I saw it.

"Q. At what time was the payment made that had

not been credited on that note that you noticed at that time? A. It was in June.

"Q. What year? A. '79.

"What was the amount of that payment? A. It was $300. I have recollection of that. After at your house I have studied this matter over and there are several points I could give.

"Q. What did you do in the way of looking up some memorandum of it? A. I went through all my papers and looked for it.

"Q. What did you find? A. I didn't find anything when I first looked, nothing to show that ever I had packed a pound of pork in this town.

"Q. What did you finally find?

"Mr. Cullen: I object to what he finally found.

"Mr. Fry: He says he remembers the payment.

"The Court: Let him state the fact and under what circumstances he made this entry of that payment.

"Mr. Fry: You say you remember a payment had been made in June, 1879, of $300; state how that payment was made and who made to? A. That payment was made to Mr. John B. Gregory.

"The Court: By whom? A. By myself.

"Mr. Fry: At what place? A. At my pork house.

"Q. At your pork house? A. Yes, sir.

"Q. How much was that payment? A. $300.

"Q. How did you pay him? A. In the currency of the country, in paper money.

"Q. You have a recollection of that fact? A. Why, yes I do.

"Q. Now, did you afterwards—did you make any memorandum of that payment? A. Yes, sir, I did.

"Q. Have you that memorandum.

"Mr. Cullen: I object. The memorandum offered is not such memorandum as may be admitted in evidence; it is not a book entry, not shown to be kept in the usual course of business.

"The Court:   Do you seek to introduce that paper as evidence?

"Mr. Fry:   No, sir, not now.

"Q.   Now, Mr. Jones, at that time, at the time you made that $300 payment did you keep any book or memorandum of your daily work or business?   A.   Yes, sir.

"Q.   Now how did you keep it?   A.   I kept it in my pocket.   Whenever I would buy anything from anybody I would put it down, and whenever I would pay anything I would put it down in this book.

"Q.   What kind of a book?   A.   Similar to that. When I paid anybody anything I marked it down and if I bought any hogs or anything I would put it down there too, and I kept a book of that kind until '95, as long as I was dealing.

"Q.   '85 you mean?   A.   No, sir, '95.

"Q.   You kept a book of that kind in '79.   A.   Yes, sir.

"Q.   At the time you made that payment?   A. Yes, sir.

"Q.   Do you know what became of that book?   A. No, sir, I do not.

"Q.   Do you know what you did in the way of keeping any parts of that book?   A.   I don't know as to that now.

"Q.   Well, is the paper you have in your hand a part of that book?   A.   Of that book?

"Q.   Yes, sir, of '79?   A.   Oh, I would not say whether it is a part of that book or the book I had before.

"Q.   Well what was your custom, did you make memorandums of that kind and file them away in '79?

"Mr. Cullen:   I object to what his custom was.

"Q.   Well, did you do that?   A.   Yes, sir.

"Q.   Well, now, just state to the jury how you did it?   A.   I can't tell you how this got on that book.

"Mr. Cullen: I object. It is incompetent testimony. It is no more or less than a declaration in his own favor.

"Mr. Clay: We have not offered to introduce the paper.

"The Court: What was your question?

"Mr. Fry: I asked him what was his custom in the way of keeping a memorandum of his business in '79.

"The Court: Do you want to know whether he did keep it?

"Mr. Fry: No, sir. I want to know how he kept it.

"The Court: You may answer whether you kept a memorandum of your business in '79? A. I did in '79 and ever after that.

"Q. You did keep it? A. I had three books I kept my pork business in, these books I used in carrying them with me in buying stock. There is one of these preserved. I kept them as my books the same as any other.

"The Court: Is that paper you hold in your hand a portion of your account book you kept in '79? A. Yes, sir, it is.

"Mr. Fry: Now we offer this in evidence.

"Mr. Cullen: I object to it as presented. It does not appear to be a memorandum made in the usual course of business, but simply a part cut from a book.

"The Court: He says it is a portion of his account book which he kept in '79. Where is the balance of the book? A. Judge, I don't know.

"Q. You don't know? A. No, sir.

"Q. Do you know when this was separated from the book, this piece of paper? A. I can't just state. It was separated prior to my drawing off a whole lot of little accounts because it was hung on that hook with those accounts, and they would run on from 25 cents to two or three dollars—little bit of accounts—I took

them all off of the hook, and I am satisfied this was taken off at the same time as these little accounts.

"Q. When? A. That was in '79.

"Q. '79? A. Haven't you got some of those? You can see where they were torn off. I was posting up all those probably on the day book. That was my book that I carried in my pocket.

"Mr. Fry: Well, we offer this memorandum in evidence.

"Mr. Cullen: I desire to ask the witness some questions on that.

"The Court: I think that is proper.

"Mr. Cullen: Q. Now, Mr. Jones, that slip of paper, which Mr. Fry just handed to me and which you have in your hands, you have no personal recollection of making that entry, have you? A. I had as soon as I saw it.

"Q. But before you saw it? A. I was satisfied I was entitled to a credit.

"Q. That is not my question. Before you found this slip of paper you had no recollection of having made any book entry of the payment of $300? A. I did that. I had made a claim that I paid more.

"Q. You gave your deposition in this case didn't you? A. Sir?

"Q. You gave your deposition in this case didn't you? A. Yes, sir.

"Mr. Fry: We object. He is not cross-examining the witness now.

"The Court: The objection is well taken.

"Plaintiff excepted at the time and saved his exceptions.

"Q. You say you had a personal recollection of making this entry before you found it? A. I had a personal recollection of making entries in my day books when I paid him money.

"Q. The question is, had you any personal recollection of making this particular entry before you found

it? A. That is one of the entries I refer to as not having been credited on the note.

"Q. Pay attention to my question. Before you found this slip of paper did you have any recollection of having made an entry of that kind, did you or not? A. Well, I can't say. It was just a recollection that I was entitled to more credits than I had and I had a book of that kind that I could refer to.

"Q. This book that you think this was cut from was not a book that you kept in your business generally? A. It was a book that I kept in my business generally as long as it lasted, in buying stock and shipping stock while in the pork house.

"Q. That was simply your pocket memorandum that you carried with you? A. Yes, sir, but you might call it my book. It was my book of business, that is what it was.

"Q. Isn't it a fact you kept that account in a book about that size? A. Yes, sir, about this size.

"Q. And is it not a fact that is a book you had been keeping your private transactions in? A. You can call it private; it was transactions which I was doing at the time, whether large or small.

"Q. All the business that you did was put in that book? A. All the business that I did in the way of buying and paying for stock was put in these books. They were just as any man would keep a book and keep his business.

"Q. That was the only book you kept in your business? A. Which?

"Q. These small books are all you ever had? A. No, sir. My pork house books had no connection with it.

"Q. The books you kept in connection with your business in handling pork didn't contain any entry of this kind? A. Not that I remember.

"Q. The book you think you got this from was a book you carried in your pocket and credited sales in? A. I didn't think anything about it. It was a book I

carried in my pocket. I kept books in the pork house and many entries in my pork house books were taken from those books where I would buy hogs.

"Q. What other entry was on that page? A. I don't know, sir.

"Q. What other entry was in that book? A. 1 could not tell you.

"Q. You don't know what entry preceded it nor what entry followed it? A. No, sir, I don't know. It was cut from the bottom and none followed it.

"Q. On the succeeding page? 'A. Yes, sir, the book was filled up with my business; what I was doing.

"The Court: What was the occasion for your cutting that from the book? I don't understand why you did it.

"A. Well, sir, the book I expect was about full, about filled up, and I considered that of some importance to me.

"Mr. Cullen: You have not the remotest recollection of why you cut that out? A. I have cut out others.

"Q. Those you found since your deposition was taken? A. Since my deposition was taken? Well, I may that.

"Q. Mr. Jones, you were acquainted with Gregory quite awhile? A. Certainly.

"Q. You knew his name was Gregory not Grudgory? A. I didn't know how it was spelled, whether it was Gregory or Gudgory.

"Q. You know it is not I. B. Gedgorn?

"Defendant objected. It is for the jury to state whether an 'I' or a 'J.'

"A. It is not an 'I' at all. It is a 'J.'

"Mr. Fry: This is your own writing? A. Yes, sir.

"Mr. Cullen: Where do you put the 'r' in Gregory? A. I don't know, I am no speller.

"Q. This is Gedgory? A. No, sir, it is J. B. Gregory.

"Q. Spell it as written there. A. Well, I might have spelled it that way, Mr. Cullen.

"Q. How is it written there?

"Mr. Fry: The paper shows for itself.

"The Court: The objection is well taken.

"Plaintiff excepted at the time and saved his exceptions.

"The Court: Did you intend by that name John B. Gregory, who is the plaintiff in this suit? A. That is what I intended to spell there. I am much obliged to you, Judge. Good many of us are not educated.

"Mr. Cullen: You knew Gregory didn't spell his name Gudory? A. I don't know; I never saw him sign his name in my life. I don't know anything about that. I say that is the way I spell it.

"The Court: It seems prima facie it would be admissible, coming from the proper source, from the books kept in the regular course of his business.

"Mr. Cullen: I object for the reasons given before.

"Court overruled the objection and plaintiff excepted at the time and saved his exceptions.

"Mr. Fry then read in evidence memorandum identified by witness, which is in words and figures following, to-wit:

"'June 9, 1879. Cash paid J. B. Gregory, $300.

"'J. S. Jones.'

"Q. Now, Mr. Jones, in June, 1879, were you indebted to Mr. J. B. Gregory in any other way than this note sued on here? A. None whatever, didn't owe him a cent.

"Q. Mr. Jones, here is a memorandum in this book here, '85, whose handwriting is that? A. It is mine.

"Q. When did you make that entry? A. Well,

what is it? I can't see. Will you just read it to me. '85, I entered that December 10, '85.''

This witness further testified that he copied from the memorandum book, from which the slip read in evidence was cut, a number of small accounts on divers persons and that he hung these with the slip on a hook and sometime afterwards placed them in an envelope containing an insurance policy and put the envelope in the bottom of a box in which he kept his papers and that after a search among his papers he found them two days before the suit was commenced in the envelope where he had placed them. Over the objection of plaintiff these accounts (sixteen in number) were read in evidence. He (defendant Jones) also testified that he made an entry in memorandum books of each payment he had made on the note and was permitted, over the objection of plaintiff, to read from several of these memorandum books entries of other payments made on the note about which there was no controversy.

In 1879, Jones was engaged on his own account in the pork packing business in Audrain county, Missouri, and he testified that he kept the accounts of his business in pocket memorandum books; that he sold spareribs, backbones and sausages to the town people and kept their account in the same kind of memorandum books and from one of these he cut the slip read in evidence. He was not able to produce the book itself or to account for it further than to say that some of his account books had been lost in a fire.

Plaintiff testified that Jones made no payment at all on the note in the year 1879, and that he entered on the back of the note every payment made and the time it was made.

Plaintiff's son testified that in 1880 he was in partnership with Jones in the pork-packing business and that in discussing money matters between them, Jones stated to him that he owed the plaintiff a note of $1,200 and had made no payment thereon.

There is other evidence of a circumstantial nature tending to show that no payment was made on the note in the year 1879.

1. Plaintiff's contention is that the court erred in admitting the slip of paper containing the entry or memorandum made by Jones of the payment of $300, June 9, 1879, and in admitting the copies of accounts of third parties taken from Jones's books, and also in admitting the entries in his books of other payments on the note that were not in dispute. Leaving out of consideration the fact that the book, from which the slip was taken, was not produced or satisfactorily accounted for, nor any good reason given for its mutilation, the question arises whether or not the slip read in evidence and other similar entries made at other times and in other books are the proper subjects of book account and as such admissible in evidence.

The last clause of section 4652, Revised Statutes 1899, which section first appeared in the General Statutes of 1865, provides "that in actions for the recovery of any sum or balance due on account, and *when the matter at issue and on trial is proper matter of book account,* the party living may be a witness in his own favor so far as to prove in whose handwriting his charges are, and when made, and no farther."

The succeeding section (4653) provides: "The court before which any action for the recovery of any sum or balance due on account, and where the matter at issue and on trial is a proper and usual subject of charge on books of account, may require either party to produce, at the trial, either his ledger or original book of entries, or both; and no disputed account shall be allowed upon the oath of the party, when it shall appear that he has a book of original entries, unless such book shall be produced upon reasonable request."

In Anchor Milling Co. v. Walsh, 108 Mo. l. c. 282, the Supreme Court, through BLACK, J., in commenting on these sections, said: "We think these sections were

designed to, and do give complete recognition to the rule which then prevailed and now prevails in most of the States and is sometimes called the American rule; namely, that contemporaneous book entries are evidence for, as well as against, the party by whom they are kept.''

In Robinson v. Smith, 111 Mo. 205, it was held: ''Bank books containing original entries and shown to have been accurately kept and written up each day are admissible in evidence in favor of the persons by whom they are kept.'' Substantially the same ruling was made in Seligman v. Rogers, 113 Mo. 642; Borgess Investment Co. v. Vette, 142 Mo. 560; Missouri E. L. & P. Co. v. Carmody, 72 Mo. App. (St. L.) 534. See also Smith v. Smith, 52 L. R. A. 545, and note.

The rule admitting books of account in evidence when supplemented by the oath of the party had its origin in necessity and is supported on the theory that they are the best evidence attainable of the transactions written in them. If, therefore, the transactions recorded are not the proper subject of book account they do not come within the reasoning of the rule. If the usual course of business is to preserve the evidence of the transaction in some other way as by some other writing or voucher, it is not the proper subject of book account.

In Jewett, Admr., v. Winship et al., 42 Vt. 204, it was held that under the Vermont statute—from which our statute (section 4652, supra) was taken—a payment that operates presently to diminish or extinguish an existing debt is not a subject of book charge.

In Smith v. Rentz, 131 N. Y. 169, it was held that the ruling, which admitted books of account properly kept as evidence, ''does not apply to books or entries relating to cash items or dealings between the parties.'' After stating the necessity for the rule admitting book accounts as evidence the court said: ''But the same necessity does not exist in respect to cash transactions.

They are usually evidenced by notes, or writing, or vouchers, in the hands of the party paying or advancing the money. Moreover, entries of cash transactions may be fabricated with much greater safety and with less chance of the fraud being discovered than entries of goods sold or delivered, or of services rendered.''

Substantially the same ruling was made in Sanford v. Miller, 19 Ill. App. 536.

The only items entered by Jones in his memorandum account book of any transactions with the plaintiff were the cash items, which he testified were payments on the note. Payments of this character are ordinarily evidenced by an indorsement of them on the back of the note and we think that both upon principle and authority such entries are not the proper subject of book account and that they do not come within the purview of the statute or the reasoning of the rule.

2. The only purpose the reading in evidence of the sixteen copies of meat accounts against third parties could serve was to corroborate Jones's evidence in respect to his having hung them on a hook with the slip read in evidence and then placing them in an envelope, where he found them twenty years afterwards. Neither a witness nor a book of account can be corroborated in this manner. At most the entries made by Jones of cash paid to plaintiff are memoranda from which he might have refreshed his memory as to dates, etc., of the payments but not as to the fact of payment.

The judgment is reversed and the cause remanded. *Reyburn, J.,* and *Goode, J.,* concur.